# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| DO NO HARM, a nonprofit corporation incorporated in the State of Virginia,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM LEE, in his official capacity as Governor of the State of Tennessee,<br><br>Defendant. | Case No. 3:24-cv-01334<br><br>**JUDGE TRAUGER** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

Tennessee law requires Defendant William Lee, in his official capacity as Governor of the State of Tennessee, to appoint individuals to the Board of Chiropractic Examiners (Chiropractic Board) solely on account of their race. Tenn. Code §§ 8-1-111; 63-4-102(c). Specifically, when considering individuals for appointment to the Chiropractic Board, the Governor "shall strive to ensure that at least one (1) person serving on the board is . . . a member of a racial minority." § 63-4-102(c). Further, Tenn. Code § 8-1-111 mandates that the Governor "shall strive to ensure that at least one (1) such citizen serving on each such board, commission, committee, or other governing or advisory entity [of the executive branch of state government] is . . . a member of a racial minority." Collectively, these statutes require the Governor to consider race in every appointment to state boards, and individuals who are not a racial minority are at a distinct competitive disadvantage for nominations to the Board.

Requiring the Governor to make appointment decisions based on an individual's race is not only morally wrong, it is blatantly unconstitutional. Plaintiff Do No Harm, on behalf of its multiple Tennessee members, filed this lawsuit on November 7, 2024, challenging the race-based mandates of sections 8-1-111 and 63-4-102(c) as violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[1] ECF No. 1. Do No Harm seeks preliminary relief to prevent the Governor from considering the race of candidates for current and future openings on the Chiropractic Board. Do No Harm has one or more members who are qualified, ready, willing, and able to be appointed to fill these openings, but they are disfavored because they are not a racial minority. As discussed below, because all factors for granting preliminary relief are satisfied, this Court should grant Do No Harm's motion for a preliminary injunction.

## STATEMENT OF FACTS

A.  **Openings on the Chiropractic Board**

The Chiropractic Board is comprised of seven members appointed by the Governor. Five of those members must be licensed Tennessee chiropractors who have been actively engaged in chiropractic practice in Tennessee for at least five years. Tenn. Code § 63-4-102(a). Board members must be actively engaged in chiropractic practice in Tennessee and not actively engaged in the practice of any other branch of the healing arts. *Id.* § 63-4-102(f), (g). In addition to these legal criteria, the Governor

---

[1] Plaintiff's Complaint also alleges that a similar mandate applicable specifically to the Board of Medical Examiners, Tenn. Code § 63-6-102(c), is unconstitutional, but Plaintiff does not currently seek a preliminary injunction against that statute.

must "strive to ensure . . . that at least one (1) person serving on the board is a member of a racial minority." *Id.* at §§ 63-4-102(c); 8-1-111.

There is currently one opening on the Chiropractic Board for a licensed chiropractor. Trotter Decl., Ex. A. That seat became available on May 1, 2024, and currently has a Caucasian holdover until a successor is appointed by the Governor and qualifies. Trotter Decl. ¶ 6, Ex. A, B, C; Tenn. Code § 63-4-102(e). The Chiropractic Board's other six members are all Caucasian. Trotter Decl., Ex. D-I. Thus, in filling the current opening on the Chiropractic Board, the Governor must "strive to ensure" that his appointee "is a member of a racial minority." Tenn. Code §§ 63-4-102(c); 8-1-111.

Should the Governor simply reappoint the holdover member of the Chiropractic Board, *see id.* § 63-4-102(e), additional openings are scheduled to occur on May 1 of 2025, 2026, 2027, and 2028. Trotter Decl., Ex. A. Openings on the Board can also occur unpredictably in the event of a resignation, removal, or death of a Board member.

**B. Do No Harm**

Do No Harm is a national nonprofit corporation headquartered in Glen Allen, Virginia. Rasmussen Decl. ¶ 3. It is a membership organization of over 6,000 medical professionals, students, policymakers, and concerned citizens. *Id.* Its mission is to protect healthcare from a radical, divisive, and discriminatory ideology focused on identity. *Id.* Do No Harm's membership includes one or more individuals who are

qualified for membership on the Chiropractic Board but for sections 8-1-111 and 63-4-102(c). Rasmussen Decl. ¶¶ 4-5.

Do No Harm Member "A" is a licensed chiropractor in Tennessee. Member A Decl. ¶ 6. He is not a member of a racial minority. Member A Decl. ¶ 5. Member A resides in Tennessee and has practiced chiropractic for 15 years. Member A Decl. ¶¶ 3, 6. Member A is actively engaged in chiropractic practice and does not practice any other branch of the healing arts. Member A Decl. ¶ 6. Member A is qualified, ready, willing, and able to be appointed to the Chiropractic Board for the current or a future opening. Member A Decl. ¶¶ 4, 6.

## LEGAL STANDARD

A preliminary injunction is "designed to preserve the relative positions of the parties until a trial on the merits can be held." *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). In deciding whether to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the Court must consider: "(1) the moving party's likelihood of success on the merits; (2) the moving party's likelihood of suffering irreparable injury absent the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) the degree to which the injunction would serve the public interest." *Towerco 2013, LLC v. Berlin Twp. Bd. of Trs.*, 110 F.4th 870, 879 (6th Cir. 2024). The third and fourth factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The familiar four factors "are not prerequisites, but are factors that are to be balanced against each other." *Jones v. Caruso*, 569 F.3d 258, 265 (6th

Cir. 2009). Nevertheless, the likelihood-of-success factor is typically most important for the court's analysis. *Towerco*, 110 F.4th at 880.

## ARGUMENT

## I

## DO NO HARM IS LIKELY TO SUCCEED ON
## THE MERITS OF ITS EQUAL PROTECTION CLAIM

Do No Harm is likely to succeed with its claims that sections 8-1-111 and 63-4-102(c) violate the Fourteenth Amendment's Equal Protection Clause. The "core purpose" of the Equal Protection Clause is "do[ing] away with all governmentally imposed discrimination based on race." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)). "Eliminating racial discrimination means eliminating all of it." *Id.*; *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."). Because sections 8-1-111 and 63-4-102(c) establish express race-based mandates, they are "presumptively invalid," *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021), and subject to strict scrutiny, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny"). Strict scrutiny places the burden on the government to prove that racial classifications are "narrowly tailored measures that further compelling governmental interests." *Id.* Strict scrutiny "is a very demanding standard, which few programs will survive." *Vitolo*, 999 F.3d at 360.

## A. The Race-Based Mandates in Sections 8-1-111 and 63-4-102 Do Not Further a Compelling Governmental Interest

The government is required to establish a compelling interest for engaging in race-conscious actions because it "assur[es] that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality op.). After *Students for Fair Admissions*, only two compelling interests justify race-based government action: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," or (2) avoiding imminent risk of riots in a prison. 600 U.S. at 207. The latter interest obviously does not apply here, but neither does the former. Sections 8-1-111 and 63-4-102(c) can only further a compelling interest in remedying past discrimination if: (1) they "target a specific episode of past discrimination;" (2) there is "evidence of intentional discrimination in the past;" and (3) the government "had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361.

The Governor cannot show that sections 8-1-111 and 63-4-102(c) remedy past discrimination because there is no evidence that Tennessee governors discriminated against racial minorities in appointments to the Chiropractic Board or any other board. The race-based mandate established in section 8-1-111 was created in 1988, with 63-4-102(c) being created in 2000. *See* 1988 Tenn. Pub. Acts 1013; 2000 Tenn. Pub. Acts 618. During Senate proceedings where the bill (SB 2350) that became

6

section 8-1-111 was discussed,[2] there was no mention of any specific facts or evidence justifying a remedial governmental interest behind imposing a race-based mandate for appointments to state boards. Audio Recording (1242) of Senate Government Operations Committee hearing at 36:55 (Apr. 13, 1988) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (790) of Senate State and Local Government Committee hearing at 25:10 (Apr. 19, 1988) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (1177) of Senate Session at 35:19 (Apr. 26, 1988) (on file with Tenn. State Libr. Legis. History Serv.). In fact, the legislative record contains *no discussion* of prior instances of racial discrimination in board appointments whatsoever. *See id.* There is no mention of racial disparities caused by discrimination, nor any other alleged governmental interest that could plausibly justify the facially discriminatory law. *Id.* Rather, SB 2350's sponsor (Senator Rucker) stated that the American Association of Retired Persons (AARP) simply had a goal for the year of passing the bill. Audio Recording (952) of Senate State and Local Government Committee hearing at 29:30 (Apr. 19, 1988) (on file with Tenn. State Libr. Legis. History Serv.). Because "under *Croson*, the state must have had sufficient evidentiary justification for a racially conscious statute in advance of its passage," the Governor cannot therefore show that section 8-1-111 furthers a compelling interest. *Associated*

---

[2] The racial mandate was inserted into the legislation during a Senate Government Operations Committee hearing on April 13, 1988, after the House passed HB 2349 on April 6, 1988. Audio Recording (1329) of Senate Government Operations Committee hearing at 39:01 (Apr. 13, 1988) (on file with Tenn. State Libr. Legis. History Serv.).

*Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 738 (6th Cir. 2000) (citing *Croson*, 488 U.S. at 504).

Regarding section 63-4-102(c), the history of its passage shows even less discussion of evidence supporting the race-based action it mandates. Indeed, the legislative discussions on the bill are entirely devoid of even a mention of the legislation's provision challenged in this case. *See* Audio Recording (653) of Senate Government Operations Committee hearing at 19:26 (Feb. 16, 2000) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (491) of House Government Operations Committee hearing at 13:49 (Feb. 22, 2000) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (1796) of Senate Session at 45:49 (Feb. 28, 2000) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (378) of House Health & Human Resources Committee hearing at 9:49 (March 7, 2000) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (1677) of House Session at 44:21 (March 13, 2000) (on file with Tenn. State Libr. Legis. History Serv.); Audio Recording (81) of Senate Session at 1:49 (March 29, 2000) (on file with Tenn. State Libr. Legis. History Serv.). As with section 8-1-111, this fails to meet the standards articulated in *Croson*. *See Drabik*, 214 F.3d at 738 (citing *Croson*, 488 U.S. at 504).

Of course, even if the Governor could point to racial disparities in appointments to the Chiropractic Board, "evidence of mere statistical disparities has been firmly rejected as insufficient by the Supreme Court." *Drabik*, 214 F.3d at 736. And any attempt to find support in generalized societal discrimination has been

8

Case 3:24-cv-01334   Document 12-1   Filed 12/05/24   Page 8 of 17 PageID #: 49

similarly rejected. *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1162–63 (6th Cir. 1994) (en banc) (societal discrimination insufficient to justify racial classifications). Even if there was evidence to support a sufficiently compelling remedial interest when sections 8-1-111 and 63-4-102 were enacted in 1988 and 2000, that "outdated evidence does not reflect 'prior unremedied or current discrimination.'" *Drabik*, 214 F.3d at 735 (quoting *Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993)).

## B. The Race-Based Mandates in Sections 8-1-111 and 63-4-102 Are Not Narrowly Tailored

Even if the Governor could establish a compelling governmental interest to justify the race-based mandates within sections 8-1-111 and 63-4-102(c), the Governor still must show that the mandates are narrowly tailored to remedying that past discrimination. For "[w]hen the government promulgates race-based policies, it must operate with a scalpel." *Vitolo*, 999 F.3d at 361. Sections 8-1-111 and 63-4-102(c) are not narrowly tailored for at least three reasons.

**First**. The "random inclusion of racial groups," *Croson*, 488 U.S. at 506, in race-based classifications is a telltale sign of an unconstitutionally tailored law. *See Drabik*, 214 F.3d at 737 (failure to connect included racial groups to past intentional discrimination "provide[s] preference where there has been no discrimination."). Sections 8-1-111 and 63-4-102(c) suffer from this "overinclusiveness" problem. *See Drabik*, 214 F.3d at 737. By mandating that the Governor must appoint at least one person who is a "member of a racial minority," the statutes give preference to

individuals from racial groups with no history of discrimination in Tennessee. *See id.* This result "suggests"—if not conclusively establishes—that the purpose in creating the race-based mandate "was not in fact to remedy past discrimination" against members of an identified group. *Croson*, 488 U.S. at 506.

**Second**. "Narrow tailoring also implies some sensitivity to the possibility that a program might someday have satisfied its purposes." *Drabik*, 214 F.3d at 737. Thus, racially conscious government programs must have a "logical end point." *Students for Fair Admissions*, 600 U.S. at 212 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003)). This requirement is "critical" because "'deviation from the norm of equal treatment' must be 'a temporary matter.'" *Id.* (quoting *Grutter*, 539 U.S. at 342). *See also Adarand*, 515 U.S. at 238 (race-conscious programs must "not last longer than the discriminatory effects [they are] designed to eliminate."). Here, sections 8-1-111 and 63-4-102(c) do not have any end date for their race-based mandates. Because they last in perpetuity, they are perpetually unconstitutional.

**Third**. Narrow tailoring requires the government to engage in "serious, good faith consideration of workable race-neutral alternatives" that would allow it to achieve a compelling interest. *Grutter*, 539 U.S. at 339. This will ordinarily require that the legislature "carefully examined and rejected race-neutral alternatives." *Croson*, 488 U.S. at 507. Here, however, there is no evidence that Tennessee considered any race-neutral alternatives before turning to race. *See Drabik*, 214 F.3d at 738 (no narrow tailoring where record "contains no evidence 'that the [legislature] gave any consideration to the use of race-neutral means . . . before resorting to race-

10

Case 3:24-cv-01334    Document 12-1    Filed 12/05/24    Page 10 of 17 PageID #: 51

based quotas.'"); *Vitolo*, 999 F.3d at 363 (existence of race-neutral alternatives not adopted by the government was "fatal" to strict scrutiny analysis). In fact, evidence shows that legislators had concerns about whether section 8-1-111 was "legal" and "constitutional." Audio Recording (475) of House Government Operations Committee hearing at 16:22 (Mar. 2, 1988) (on file with Tenn. State Libr. Legis. History Serv.).

Because the Governor cannot show that sections 8-1-111 and 63-4-102(c) further a compelling interest, and because the racial mandates within those sections are not sufficiently tailored, Do No Harm will prevail on its equal protection claims.

## II

### DO NO HARM AND ITS MEMBERS WILL SUFFER IRREPARABLE HARM

An injury is irreparable when it cannot be "fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Irreparable injury typically occurs where "the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). A violation of a plaintiff's Fourteenth Amendment right to equal protection of the laws "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And "when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (same). *See also Obama for Am.*, 697 F.3d at 436 ("[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed.").

Here, Do No Harm and its members will be irreparably harmed unless this Court orders preliminary relief. Specifically, Member A will be deprived of his fundamental right to equal consideration for the current opening on the Chiropractic Board. *See Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (the injury-in-fact in a case involving racial discrimination is "the inability to compete on an equal footing"). As discussed, sections 8-1-111 and 63-4-102(c) require the Governor to discriminate against Member A based on race. Therefore, Member A cannot be considered equally to other similarly qualified candidates.

Preliminary relief is needed to ensure that Member A is not shut out from equal consideration from the Governor.[3] For Member A, the current opening on the Chiropractic Board has been open since May 1, 2024, but could be filled by the Governor at any time. The next available opening does not occur until May 1, 2025. As no monetary damages are available to Do No Harm and Member A to remedy the constitutional violation mandated by sections 8-1-111 and 63-4-102(c)—indeed, no damages are even sought in Do No Harm's Complaint—preliminary relief is

---

[3] That is precisely what happened in a lawsuit filed last year in this Court with these same parties in a challenge to the racial quota in appointments to Tennessee's Board of Podiatric Medical Examiners. *See Do No Harm v. Lee*, No. 3:23-cv-01175, 2024 WL 3730623 (M.D. Tenn. Aug. 8, 2024), *appeal docketed*, No. 24-5937 (6th Cir. Sep. 5, 2024). This Court held that the Governor's appointment of an African-American podiatrist to the Podiatric Board stripped the Court of jurisdiction to hear the case. *Id.*, 2024 WL 3730623, at *6. That decision is currently on appeal, but the Court's ruling necessitates Plaintiff seeking preliminary relief in this lawsuit.

necessary to avoid irreparable harm to Do No Harm and Member A until this case is resolved on the merits.

## III

## THE HARM TO DO NO HARM OUTWEIGHS ANY PURPORTED HARM TO THE GOVERNOR AND PRELIMINARY RELIEF IS IN THE PUBLIC INTEREST

### A. The Balance of Harms Favor Do No Harm

As discussed above, absent a preliminary injunction, Do No Harm and Member A will suffer significant and irreparable harm stemming from the Governor's enforcement of sections 8-1-111 and 63-4-102(c): the violation of constitutional rights and the indignity of being discriminated against on account of race.

On the other hand, should this Court grant preliminary relief, the Governor is unlikely to incur any harm. *See Vitolo*, 999 F.3d at 360 ("no cognizable harm results from stopping unconstitutional conduct"). Preliminary relief would not prevent the Governor from making an appointment for the opening on the Chiropractic Board. The Governor would simply be prohibited from considering the race of candidates for the opening.

Further, the current opening on the Chiropractic Board has been open since May 1, 2024. All other seats on the Board are filled by board members with active terms. And while the term for the Board member holding the seat with an opening has expired, that member maintains his position as a holdover until the Governor appoints a replacement who qualifies. *See* Tenn. Code § 63-4-102(e). In any event, the Board will maintain enough members to reach a quorum to conduct business. *Id.* § 63-

13

4-102(i) (4-member quorum). As a result, preliminary relief prohibiting the Governor from considering the race of candidates for the Board will not harm the ability of the Board to function. The balance of harms thus weighs in favor of preliminary relief.

**B.      Preliminary Relief is in the Public Interest**

An order enjoining enforcement of sections 8-1-111 and 63-4-102(c) is in the public interest. The public is best served, not by the use of race in the Governor's appointments to the Chiropractic Board, but rather by the "prevent[ion] [of] the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). *See also Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("it is always in the public interest to prevent violation of a party's constitutional rights."); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). Indeed, Do No Harm is not asking the Court to appoint any of its members to the Chiropractic Board. Rather, it merely seeks to require the Governor to make appointments to the Board on a race-neutral basis in conformity with the Equal Protection Clause. Compelling the Governor to conform with the constitutional guarantee of equal protection is in the public interest.

## IV

## NO SECURITY SHOULD BE REQUIRED

Courts in this circuit "possess[] discretion over whether to require the posting of security" when issuing preliminary injunctions. *Louisiana-Pacific Corp. v. James Hardie Building Prods., Inc.*, 335 F.Supp.3d 1002, 1023 (M.D. Tenn. 2018). In

14

exercising that discretion, courts consider the strength of the moving party's case and the public interest. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Given the likelihood of success on the merits of Plaintiff's claim that sections 8-1-111 and 63-4-102(c) are unconstitutional, and the strong public interest in removing racial discrimination from the appointment process for public boards, security should be waived or set at a nominal amount.

## CONCLUSION

For the reasons stated above, this Court should grant a preliminary injunction prohibiting the Governor from considering the race of candidates when making appointments to the Chiropractic Board.

DATED: December 5, 2024.

Respectfully submitted,

/s/ *Caleb R. Trotter*
Caleb R. Trotter, Cal. Bar No. 305195*
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
CTrotter@pacificlegal.org

David J. Hoffa, Ariz. Bar No. 038052*
PACIFIC LEGAL FOUNDATION
3241 E. Shea Blvd., Suite 108
Phoenix, AZ 85028
Telephone: (916) 419-7111
DHoffa@pacificlegal.org

/s/ *Daniel J. Turklay*
Daniel J. Turklay (#034600)
TURKLAY LAW
11205 Lebanon Rd #51
Mt. Juliet, TN 37122

Telephone: (615) 838-5903
Fax: (888) 868-0014
daniel@turklaylaw.com

*Pro Hac Vice*

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notice of such filing to counsel of record who are registered with CM/ECF. I also certify that I sent the foregoing document via email to Kevin M. Kreutz and Andrew D. Denning, counsel for Defendant identified in the parties' meet-and-confer conference.

Dated: December 5, 2024.

                                            Respectfully submitted,

                                            /s/ *Caleb R. Trotter*
                                            Caleb R. Trotter